UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF INDIANA
INDIANAPOLIS DIVISION

| | |
|---|---|
| JERRY A. GORE, | ) |
|     Plaintiff, | ) |
| v. | ) Case No. 1:13-cv-00241-JMS-DML |
| CORIZON,<br>DR. WILLIAM WOLFE,<br>NURSE CHRISTINE MEYER, | ) |

**Entry Discussing Motion for Summary Judgment
and Directing Entry of Final Judgment**

Plaintiff Jerry Gore ("Mr. Gore"), an Indiana prisoner incarcerated at the Pendleton Correctional Facility ("Pendleton"), brings this action pursuant to 42 U.S.C. § 1983 alleging that the defendants Corizon Health ("Corizon"), Dr. William Wolfe, and Nurse Christine Meyer were deliberately indifferent to his serious medical need for treatment of heat stroke in violation of the Eighth and Fourteenth Amendments. Defendants moved for summary judgment. The plaintiff filed a response in opposition and the defendants have replied. For the following reasons, the motion for summary judgment [Dkt. 126] is **granted**.[1]

**I. Summary Judgment Standard**

Federal Rule of Civil Procedure 56(a) provides that summary judgment is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." In ruling on a motion for summary judgment, the admissible evidence presented by the non-moving party must be believed and all reasonable inferences must be drawn in the non-movant's favor. *Hemsworth v. Quotesmith.com, Inc.*, 476 F.3d 487, 490 (7th

---

[1] The Court acknowledges its gratitude to Mr. Hull for his efforts on behalf of Mr. Gore.

1

Cir. 2007); *Zerante v. DeLuca*, 555 F.3d 582, 584 (7th Cir. 2009) ("We view the record in the light most favorable to the nonmoving party and draw all reasonable inferences in that party's favor."). However, "[a] party who bears the burden of proof on a particular issue may not rest on its pleadings, but must affirmatively demonstrate, by specific factual allegations, that there is a genuine issue of material fact that requires trial." *Hemsworth*, 476 F.3d at 490. Finally, the non-moving party bears the burden of specifically identifying the relevant evidence of record, and "the court is not required to scour the record in search of evidence to defeat a motion for summary judgment." *Ritchie v. Glidden Co.,* 242 F.3d 713, 723 (7th Cir. 2001).

## II. Undisputed Facts

Construed in a manner most favorable to Mr. Gore, the following facts are undisputed for purposes of summary judgment:[2]

At all times relevant to the allegations in his complaint, Mr. Gore was incarcerated at Pendleton.

Dr. Wolfe was a treating physician at Pendleton but was employed by Corizon. Corizon is the private company that contracts with the Indiana Department of Correction ("IDOC") to provide health care to inmates at certain IDOC facilities. Nurse Meyer was employed by Corizon as a registered nurse working at Pendleton.

Heatstroke occurs when an individual's body temperature rises rapidly and the person is unable to cool down. Heatstroke can occur without any previous heat-related condition, such as heat exhaustion. Heatstroke signs and symptoms include:

- Fever of 104 F or greater

---

[2] The facts cited in Mr. Gore's response in opposition to summary judgment are from the *pro se* amended complaint filed on November 19, 2014. Mr. Gore verified the amended complaint so the Court will treat it as an affidavit. [Dkt. 46].

- Changes in mental status or behavior, such as confusion, agitation, or slurred speech

- Hot, dry skin or heavy sweating

- Nausea and vomiting

- Flushed skin

- Rapid pulse

- Rapid breathing

- Headache

- Fainting, which may be the first sign in older adults

[Dkt. 141, at pp. 5-6; 143-1, at pp. 6, 10].[3]

On the morning of July 6, 2012, Mr. Gore played basketball outside for approximately forty-five minutes. [Dkt. 128-4, at p. 9]. He then took his daily shower around 10:45 a.m. The temperature both inside the facility and outside was particularly hot that day and there were no fans or ventilation system in Mr. Gore's cell house or the showers. [Dkt. 46, at pp. 6].

Similarly, the water temperature in the shower was hot. Soon after Mr. Gore started showering, he began sweating and passed out. He regained consciousness soon after and Sergeant Turner arrived to escort Mr. Gore back to his cell. During his escort, Mr. Gore passed out again. Sergeant Turner and Officer Watson assisted Mr. Gore to the bottom of the range, and gave him a cool rag and placed him in front of a fan. The officer in charge of the cell house called a signal 3000 medical emergency while Sergeant Turner got Mr. Gore water. [Dkt. 46, at pp. 5-8].

---

[3] Mr. Gore has included information from a medical treatise re-typed in the body of his response in opposition to motion for summary judgment. [Dkt. 141, at pp. 4-7]. Defendants helpfully provided copies of the treatises Mr. Gore references. [Dkt. 143-1]. The symptoms of heat stroke are not in dispute. So that the Court may consider this evidence, Mr. Gore's motion to take judicial notice [Dkt. 142] is **granted**. The Court has taken judicial notice of the online medical treatises designated in Mr. Gore's response within the undisputed facts.

Nurse Meyer responded to the emergency medical call from Mr. Gore's cell house. When she arrived, Mr. Gore was on the floor in front of a fan, wet from the shower, and sweating. Nurse Meyer examined him and took his vital signs. His blood pressure was 120/90 and his temperature was 97.5. She also determined that Mr. Gore's skin turgor was good, and he was conscious, coherent, and verbal. [Dkt. 128-4, at p. 4]. Mr. Gore was able to stand up and walk back to his cell. Soon after Nurse Meyer left Mr. Gore's cell house, his condition worsened and he began vomiting. He was transported to the medical clinic where Nurse Meyer again examined him and took his vital signs. His blood pressure was 130/70, and his pulse was 98. He was placed on an oxygen mask because his oxygen saturation level was only 90%. His oxygen levels returned to normal.

Nurse Meyer called Dr. Wolfe at approximately 12:15 to discuss Mr. Gore's condition. Dr. Wolfe ordered "Lactated Ringers solution by IV" to address Mr. Gore's symptoms of possible dehydration. The medical staff unsuccessfully attempted to start an IV six times. Mr. Gore also drank 16 ounces of water and was given a 25 mg injection of Phenergan for nausea. Nurse Meyer checked his vitals a third time at 2:10 p.m. His temperature was 97.3, his pulse was 72, his oxygen was 100%, and his blood pressure was 140/85. [Dkt. 128-4, at p. 4].

While he was in the clinic, Mr. Gore complained of acute right upper quadrant ("RUQ") pain. Based on this complaint, and the medical staff's inability to start an IV, Nurse Meyer called Dr. Wolfe again and recommended he be sent to an outside emergency room ("ER"). Dr. Wolfe agreed and ordered that Mr. Gore be transported to St. John's Hospital ER, approximately ten miles away, by IDOC vehicle. The IDOC vehicle was not an ambulance and the inside was very hot. Mr. Gore complained to the driver about the heat in the IDOC vehicle and that he was not

feeling well. Dr. Wolfe did not order an ambulance transport for Mr. Gore because his vital signs were stable and his condition was not an emergency. [Dkt. 128-1].

Mr. Gore was alert and not in distress when he arrived at the St. John's Hospital ER. His temperature was 98.4, his pulse was 61, and his blood pressure was 136/76. The ER physician, Dr. Steven Hill, noted that in 2010 Mr. Gore had been admitted to Wishard Hospital for a similar situation and underwent a heart catheterization, which reflected normal coronary arteries, although there was a question as to possible aortic stenosis, which was not evaluated. [Dkt. 128-4, at p. 9]. Dr. Hill admitted Mr. Gore for further evaluation and ordered IV fluids for rhabdomyolysis.[4] He also ordered aggressive hydration, a repeat enzyme test the following morning, and recommended that a cardiologist obtain an echocardiogram. [Dkt. 128-4, at p. 10].

On July 6, 2012, an abdominal CT scan was done to rule out gallstones, pancreatitis, and other potential causes of Mr. Gore's reported right upper quadrant pain. On July 7, 2012, cardiologist, Dr. Adam Greene, evaluated Mr. Gore and noted that Mr. Gore was alert and oriented and in no acute distress. Dr. Greene documented that Mr. Gore was generally physically active and played basketball approximately five (5) days per week. Dr. Greene also noted that Mr. Gore's cardiac exam was "quite normal" and ordered an EKG, which was also normal and demonstrated no evidence of aortic stenosis. Dr. Greene concluded that Mr. Gore had likely experienced dehydration, which had improved after receiving IV fluids overnight (as evidenced by Mr. Gore's improved biochemical markers). [Dkt. 128-4, at pp. 12-17].

On July 9, 2012, Dr. Imran Nasir evaluated Mr. Gore and noted that Mr. Gore was "feeling much better, with no nausea, or abdominal pain." On July 10, 2012, Mr. Gore was discharged from

---

[4] Rhabdomyolysis is a syndrome characterized by the leakage of muscle-cell contents into the circulation. Non-traumatic rhabdomyolysis may be caused by excessive physical exertion and heat stroke. [Dkt. 141, at p. 7].

5

the St. John's Hospital ER with instructions to drink plenty of fluids and to avoid working out for one (1) week. No further follow-up treatments or medications were recommended or prescribed. [Dkt. 128-4, at pp. 18-22].

### III. Discussion

In the second amended complaint, Mr. Gore alleges that defendants were deliberately indifferent to his alleged heat stroke on July 6, 2012, in violation of the Eighth and Fourteenth Amendments.[5] Specifically, Mr. Gore alleges Dr. Wolfe and Nurse Meyer failed to properly diagnose and treat his condition, and negligently allowed him to be transported to St. John's Hospital in an IDOC vehicle rather than by ambulance. Mr. Gore also alleges that Corizon failed to maintain policies, practices, or procedures designed to ensure that he received medical care within the standard of care while he was incarcerated at Pendleton, and that Corizon failed to adequately train and supervise medical staff at Corizon. [Dkt. 79]. Mr. Gore also alleges the defendants were negligent in treating his medical needs and that Corizon breached the contract between Corizon and the IDOC related to health care services for inmates at Pendleton.

**A. Deliberate Indifference-Nurse Meyer and Dr. Wolfe**

In support of the motion for summary judgment, Dr. Wolfe and Nurse Meyer argue they were not deliberately indifferent to Mr. Gore's medical needs. Pursuant to the Eighth Amendment, prison officials have a duty to provide humane conditions of confinement. This means that officials must take reasonable measures to guarantee the safety of the inmates and ensure that they receive adequate food, clothing, shelter, and medical care. *Farmer v. Brennan*, 511 U.S. 825, 834 (1994). To prevail on an Eighth Amendment claim of deliberate indifference to medical needs, a plaintiff

---

[5] Mr. Gore's Fourteenth Amendment claim is not applicable to the circumstances presented. The Eighth Amendment is the most applicable constitutional provision and no due process issues have been alleged.

6

must demonstrate two elements: (1) he suffered from an objectively serious medical condition; and (2) the defendant knew about the plaintiff's condition and the substantial risk of harm it posed, but disregarded that risk. *Id.* at 837; *Pittman ex rel. Hamilton v. County of Madison, Ill.*, 746 F.3d 766, 775 (7th Cir. 2014).

The Court reviews "the totality of an inmate's medical care when considering whether that care evidences deliberate indifference to serious medical needs." *Petties v. Carter*, 836 F.3d 722, 728 (7th Cir. 2016) (citing *Cavalieria v. Shephard*, 321 F.3d 616, 625-26 (7th Cir. 2003)). The Seventh Circuit has explained that "[a] medical professional is entitled to deference in treatment decisions unless no minimally competent professional would have [recommended the same] under those circumstances." *Pyles v. Fahim*, 771 F.3d 403, 409 (7th Cir. 2014). "Disagreement between a prisoner and his doctor, or even between two medical professionals, about the proper course of treatment generally is insufficient, by itself, to establish an Eighth Amendment violation." *Id.* But deliberate indifference can be inferred in some circumstances, such as when a doctor "persists in a course of treatment known to be ineffective." *Petties*, 836 F.3d at 730 (citing *Walker v. Peters*, 233 F.3d 494, 498 (7th Cir. 2000)). Similarly, deliberate indifference may exist when the course of treatment is "so blatantly inappropriate as to evidence intentional mistreatment likely to seriously aggravate" the inmate's condition. *Snipes v. DeTella,* 95 F.3d 586, 592 (7th Cir. 1996) (internal quotations omitted).

Mr. Gore alleges he suffered from heat stroke on July 6, 2012. However, the evidence, including Mr. Gore's medical records, do not support this assertion. Rather, Dr. Gregory Pugh, an independent physician who is Board-Certified in Emergency Medicine, opined that Mr. Gore likely experienced dehydration, heat exhaustion and rhabdomyolysis. The defendants do not dispute that Mr. Gore suffered a heat related event. Thus, the material issue in this case is not what

kind of heat related event Mr. Gore suffered, but whether the defendants' response to the event was deliberately indifferent.

The defendants argue that Mr. Gore was provided with appropriate care, and they were not deliberately indifferent to a serious medical need. Mr. Gore alleges that Nurse Meyer and Dr. Wolfe delayed, and then failed, to treat him after he suffered heatstroke, which resulted in further injuries and a four day hospital stay.

Nurse Meyer and Dr. Wolfe have shown they were not deliberately indifferent to Mr. Gore's medical needs. Mr. Gore's allegations of deliberate indifference and negligence are not consistent with his medical records, which reflect that he received immediate and medically appropriate treatment for his condition.

When Nurse Meyer initially evaluated Mr. Gore in the cell house after he passed out in the shower, his blood pressure was 120/90 and his temperature was 97.5. She also determined that Mr. Gore's skin turgor was good, and he was conscious, coherent, and verbal. [Dkt. 128-4, at p. 4]. Mr. Gore showed no signs of heat stroke and was able to stand up and walk back to his cell. Mr. Gore was transported to the medical clinic when his condition worsened. Nurse Meyer called Dr. Wolfe and administered oxygen and anti-nausea medication. She also took his vitals again at 2:10 p.m. His temperature was 97.3, his pulse was 72, his oxygen was 100%, and his blood pressure was 140/85. [Dkt. 128-4, at p. 4]. When Mr. Gore arrived at the St. John's ER, he was alert and not in distress. His temperature was 98.4, his pulse was 61, and his blood pressure was 136/76. Mr. Gore's medical records conclusively show that his vitals were normal and he was stable, both before he was transported to the ER and after he arrived.

Dr. Gregory Pugh, after reviewing Mr. Gore's medical records from the IDOC and St. John's Hospital, has concluded, to a reasonable degree of medical certainty that Dr. Wolfe and

8

Nurse Meyer complied with the standard of care in their treatment of Mr. Gore on July 6, 2012. Specifically, Nurse Meyer timely responded to initial reports that Mr. Gore required medical attention, and appropriately assessed Mr. Gore, took his vital signs, which were within normal limits, and determined that follow-up care was not necessary. Nurse Meyer also immediately contacted Dr. Wolfe for orders when Mr. Gore presented to the medical unit for reported vomiting shortly after Nurse Meyer's initial assessment. She attempted to follow Dr. Wolfe's orders to administer IV fluids without success. However, Dr. Pugh opined it is not uncommon for nurses, including ER nurses with whom he works, to have difficulty in establishing IV access after several attempts. After she was unsuccessful in administering an IV, Nurse Meyer contacted Dr. Wolfe, who ordered that Mr. Gore be transferred to an outside ER for further care. The overall timeframe in which Nurse Meyer rendered care and contacted Dr. Wolfe for orders to transfer Mr. Gore was entirely appropriate according to Dr. Pugh, and Mr. Gore has not provided any evidence to the contrary. Dr. Pugh also concluded that Dr. Wolfe ordered entirely appropriate and standard medical treatments (IV fluids and anti-nausea medication) for Mr. Gore's subjective complaints and objective symptoms. Additionally, Mr. Gore's condition at the time he was sent to the St. John's Hospital ER was not emergent, his most recent vital signs prior to transfer (taken at approximately 2:10 p.m.) were well within normal limits, and therefore, the decision to transfer Mr. Gore by IDOC vehicle, as opposed to ambulance, was entirely appropriate. [Dkt. 128-3].

      Finally, Dr. Pugh concluded that Mr. Gore likely did not experience heat stroke on July 6, 2012, but instead likely experienced dehydration, heat exhaustion, and rhabdomyolysis. He based his conclusion on the fact that Mr. Gore's body temperature never exceeded 98.6 degrees (normal body temperature) and, in fact, was below-average (97.3 degrees) prior to admission to the St. John's Hospital ER and that Mr. Gore was never incoherent, which points strongly away from heat

9

stroke, which almost always involves a mental status change. [Dkt. 128-3]. In his response in opposition to summary judgment, Mr. Gore disputes the evidence provided by Dr. Gore by either relying on his own affidavit or by simply stating he disputes the statement of Dr. Pugh. [Dkt. 141, at pp. 7-10]. At summary judgment, whether a party asserts that a fact is undisputed or genuinely disputed, the party must support the asserted fact by citing to particular parts of the record, including depositions, documents, or affidavits. *Fed. R. Civ. P. 56*(c)(1)(A). Simply stating you dispute the statement of an expert, without more, is not sufficient.

Nurse Meyer and Dr. Wolfe have shown that the medical care they provided Mr. Gore on July 6, 2012, for a heat related event, was timely, reasonable, and appropriate. Mr. Gore has presented no evidence to dispute the medical records which show Mr. Gore's vitals were normal, and that he was stable and alert both immediately before and after arriving at the ER, or the opinion of Dr. Pugh, that Nurse Meyer and Dr. Wolfe complied with the standard of care. As such, Nurse Meyer and Dr. Wolfe are entitled to summary judgment on the Eighth Amendment claim against Dr. Wolfe and Nurse Meyer.

**B. Policy, Practice, or Procedures Claim- Corizon**

Mr. Gore alleges that Corizon has a policy, practice or procedure that was deliberately indifferent to his medical needs. He also alleges that Corizon failed to maintain policies, practices or procedures to ensure he received medical care and treatment within the standard of care, and that Corizon failed to adequately train and supervise medical staff at Pendleton.

Deliberate indifference claims brought pursuant to 42 U.S.C. § 1983 against a corporation like Corizon cannot be based on the theory of *respondeat superior*. *Chaves v. Illinois State Police*, 251 F.3d 612, 651 (7th Cir. 2001); *Moore v. State of Indiana*, 999 F.2d 1125, 1129 (7th Cir. 1993). Because Corizon acts under color of state law by contracting to perform a government function,

*i.e.* providing medical care to correctional facilities, it is treated as a government entity for purposes of section 1983 claims. *See Jackson v. Illinois Medi–Car, Inc.*, 300 F.3d 760, 766 (7th Cir. 2002).

To state a deliberate indifference claim against Corizon, Mr. Gore must establish that he suffered a constitutional deprivation as the result of an express policy or custom of Corizon. *Id.* Mr. Gore must show that Corizon has: (1) an express policy that, when enforced, causes a constitutional deprivation; (2) a practice that is so wide-spread that, although not authorized by written or express policy, is so permanent and well-settled as to constitute a custom or usage with the force of law, or (3) an allegation that the constitutional injury was caused by a person with final policy making authority. *Estate of Moreland v. Dieter*, 395 F.3d 747, 758–759 (7th Cir. 2004). In addition to showing that his medical care was affected by a policy, custom, or procedure of Corizon, Mr. Gore must also offer evidence of other offenders who have been subjected to the same allegedly indifferent conduct as he complains about, because a custom cannot be established through a single incident. *Palmer v. Marion County*, 327 F.3d 588 (7th Cir. 2003).

As an initial matter, Mr. Gore did not designate any evidence that it was the policy, custom, or procedure of Corizon that led to the alleged deliberate indifference. Mr. Gore may not proceed under the theory of *respondeat superior*. As Mr. Gore has not presented a shred of evidence that his alleged lack of medical care was due to any corporate policy, custom, practice, or procedure of Corizon, the motion for summary judgment must be granted as to this section 1983 claim.[6]

**C. State Law Claim of Negligence**

---

[6] To the extent Mr. Gore alleges the decision to transport him to the ER by IDOC vehicle rather than by ambulance was a Corizon policy, this argument fails. Dr. Wolfe stated that he made the decision to transport Mr. Gore to the ER by IDOC vehicle. [Dkt. 128-1, at pp. 5-6]. This shows that Dr. Wolfe exercised independent medical judgment to have Mr. Gore transported by IDOC vehicle, and no underlying Corizon policy determined that an ambulance was not necessary.

Because the Court concludes that summary judgment is appropriate on Mr. Gore's constitutional claims, no federal claim remains in this litigation. The Court must assess whether it should continue to exercise supplemental jurisdiction over Mr. Gore's state law claims. The Court ultimately has discretion whether to exercise supplemental jurisdiction over a plaintiff's state law claims. *Carlsbad Tech., Inc. v. HIF Bio, Inc.*, 556 U.S. 635, 639 (2009); see 28 U.S.C. § 1367(c) ("The district courts may decline to exercise supplemental jurisdiction over a claim ... if ... the district court has dismissed all claims over which it has original jurisdiction...."). When deciding whether to exercise supplemental jurisdiction, "'a federal court should consider and weigh in each case, and at every stage of the litigation, the values of judicial economy, convenience, fairness, and comity.'" *City of Chicago v. Int'l Coll. of Surgeons*, 522 U.S. 156, 173, (1997) (quoting *Carnegie–Mellon Univ. v. Cohill*, 484 U.S. 343, 350 n. 7 (1988)).

Here, the relevant factors weigh in favor of the Court exercising supplemental jurisdiction over Mr. Gore's state law claims. The parties have fully briefed all of the state law claims. Thus retaining jurisdiction over the state law claims would promote judicial economy.

Mr. Gore alleged the defendants were negligent and owed him a duty to provide adequate medical care and they breached this duty by allowing their conduct to fall below the applicable standard of care. [Dkt. 79, at pp. 14-15]. The Court treats this as a medical malpractice claim. Mr. Gore addresses this argument in his response by describing the actions of Corizon negligent, reckless, and intentional. [Dkt. 141, at p. 14]. In order for Mr. Gore to succeed on his medical malpractice claim he must prove that (1) a duty was owed to him by the defendants; (2) the defendants breached this duty when their conduct fell below the set standard of care; and (3) he suffered an injury proximately caused by the defendants' breach of duty. *Stumph v. Foster*, 524 N.E.2d 812, 814 (Ind. Ct. App. 1988). In addition, expert testimony is generally necessary to

establish that a professional's performance fell below the requisite standard of care in a medical malpractice case. *Id*. However, expert testimony is only required when the issue of determining the standard of care is beyond the realm of the lay person. *Emig v. Physicians Physical Therapy Serv.*, 432 N.E.2d 52, 53 (Ind. App. Ct. 1982).

Mr. Gore's medical malpractice claim fails as a matter of law. There is no dispute that Mr. Gore suffered a heat related event on July 6, 2012. However, Mr. Gore failed to produce any expert testimony articulating whether the defendants' performance fell below the requisite standard of care. In contrast, the only evidence in this action shows that Dr. Wolfe and Nurse Meyer complied with the standard of care in their treatment of him on July 6, 2012. The defendants are entitled to summary judgment on this claim.

### D. Breach of Contract

Mr. Gore alleges the defendants breached the contract between the IDOC and Corizon when they failed to provide Mr. Gore with adequate medical services when he suffered a heatstroke. Mr. Gore alleged that he, and other inmates, are intended third-party beneficiaries of the contract. [Dkt. 79, at p. 14]. A third party beneficiary contract exists when: (1) the parties intend to benefit the third party, (2) the contract imposes a duty on one of the parties in favor of the third party, and (3) the performance of the terms of the contract renders a direct benefit to the third party intended by the parties to the contract. *Natl. Bd. of Examiners for Osteopathic Physicians and Surgeons, Inc. v. American Osteopathic Ass'n.*, 645 N.E.2d 608, 618 (Ind. Ct. App. 1994). However, he failed to respond to defendants' arguments that Corizon did not breach the contract between it and the IDOC. Accordingly, the Court finds that he has abandoned those claims. *United States v. Turcotte*, 405 F.3d 515, 536 (7th Cir. 2005) ("unsupported and undeveloped arguments are waived").

Mr. Gore failed to designate any evidence regarding the terms of the contract between Corizon and the IDOC. Because Mr. Gore failed to designate any evidence related to this claim, the defendants are entitled to summary judgment on this claim.

## IV. Conclusion

For the foregoing reasons, the defendants' motion for summary judgment [Dkt. 126] is **granted**. Judgment consistent with this Entry shall now issue.

**IT IS SO ORDERED**.

Date: February 7, 2017

Hon. Jane Magnus-Stinson, Chief Judge
United States District Court
Southern District of Indiana


Distribution:

Electronically registered counsel